UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BETH KRAMER, on behalf of herself and all others similarly situated,

Plaintiff,

v.

HSN, INC.,,

Defendant.

---

Docket No.

**CLASS ACTION COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiff, BETH KRAMER**,** ("Plaintiff" or "Ms. Kramer"), on behalf of herself and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, JOSEPH & NORINSBERG, LLC, as and for their putative class action complaint upon Defendant, HSN, INC., ( "HSN" or "Defendant"), hereby alleges as follows:

## INTRODUCTION

1. Plaintiff, Beth Kramer**,** is a resident of New York, New York, and is permanently disabled due to advanced Macular Degeneration complicated by Retinal Detachment, resulting in profound central vision loss. As documented by Dr. Kyle Kovacs, MD**,** St. Giles Associate Professor of Clinical Ophthalmology at Weill Cornell Medicine, on April 12, 2025, Ms. Kramer's best-corrected visual acuity measures 20/320 in the right eye and 20/280 in the left eye, with severe central field loss, dense scotomas, markedly reduced contrast sensitivity, and a functional visual field constricted to approximately 15–18 degrees**.** These findings meet the statutory definition of legal blindness under both federal and New York State law. (See Exhibit A.)

2. Due to her permanent and progressive visual impairment, Ms. Kramer relies

exclusively on screen-reading software, including NonVisual Desktop Access ("NVDA"), to navigate digital interfaces, read product information, and complete online transactions. Her dependence on assistive technology is not optional—it is essential to her ability to access goods and services on equal terms with sighted consumers. NVDA's ability to interpret properly coded websites is critical to her independence, safety, and daily functioning.

3. Plaintiff brings this civil action against **HSN, INC.,** who operates the public-facing retail website www.hsn.com, which offers nationwide access to consumer goods across categories such as beauty, home, electronics, apparel, jewelry, and seasonal merchandise. The website functions as a primary platform for browsing products, reviewing descriptions, comparing prices, accessing promotions, and completing purchases. For individuals who rely on assistive technology, the accessibility of this website is essential to participating in online retail on equal terms with sighted users.

4. On multiple occasions in 2025, Ms. Kramer attempted to use www.hsn.com with NVDA to browse products, review descriptions, compare pricing, and access category pages across beauty, home goods, electronics, and seasonal décor. These attempts included navigating product grids, opening individual product pages, reviewing promotional banners, and using the search and category navigation features. She sought to access information about specific items, including beauty products, home décor, apparel, and household goods that are marketed to the general public on HSN's platform.

5. During these attempts, Ms. Kramer encountered numerous accessibility barriers that prevented NVDA from reading or interpreting essential content. These barriers included missing or placeholder alternative text on product images; ARIA-hidden elements containing

focusable content that caused NVDA to announce silence; controls and interactive elements lacking labels; empty or improperly structured headings; broken links; empty URLs; unlabeled iframes; pricing information not programmatically conveyed; and visually hidden elements still exposed to assistive technology. These issues disrupted reading order, obscured product information, and made it difficult or impossible for her to understand or interact with key features of the website.

6. Independent SortSite audits of www.hsn.com identified widespread accessibility issues across the platform. The audit detected:

- **41 Level A issues across 14,530 pages** involving placeholder or incorrect alt text;
- **92 pages** with unlabeled ARIA controls;
- **Multiple pages** with ARIA-hidden elements containing focusable content;
- **18 pages** with empty headings;
- **Improper use of HTML elements** such as <dt> and <li> outside their required parent structures;
- **Thousands of pages** containing broken links, including repeated 400 and 404 errors;
- **Over 2,600 pages** with empty href="" or src="" attributes;
- **Carousels and interactive elements** lacking proper labeling;
- **Iframes without descriptive titles**;
- **Pricing information** does not programmatically distinguishing original from discounted prices.

These findings reflect systemic structural and coding issues across product pages, category

listings, promotional content, and navigation components.

7. Ms. Kramer sought to use HSN.com because it offers a wide range of consumer goods that she purchases for her home and personal use. As a legally blind consumer, she cannot visually inspect product packaging, images, or printed materials. She relies on accessible online product descriptions, pricing information, and navigation features to make informed purchasing decisions. When essential product information is conveyed visually but not programmatically, she cannot independently understand or evaluate the items offered.

8. HSN, Inc. is a retail company headquartered in St. Petersburg, Florida, and operates the website www.hsn.com, which is accessible to consumers nationwide, including residents of New York. The company controls the design, coding, maintenance, and operation of the website and is responsible for ensuring that its digital content is perceivable and navigable for users who rely on assistive technology.

9. Despite operating a large-scale e-commerce platform with extensive digital infrastructure, the website contains numerous accessibility barriers documented across thousands of pages. These issues appear in core shopping categories, product grids, promotional banners, navigation menus, and interactive components. The volume and distribution of these barriers indicate that accessibility considerations have not been consistently implemented across the site's design and content.

10. Because Ms. Kramer relies on NVDA to access online retail platforms, the presence of these barriers prevents her from independently browsing, reviewing, and selecting products on HSN.com. . Missing alt text, unlabeled controls, broken links, inaccessible pricing information, and improperly structured content impede her ability to understand product details,

compare items, or complete transactions. Without accessible coding practices, she cannot use the website in a meaningful or reliable way.

11. The audit findings and Ms. Kramer's user experience demonstrate that HSN.com contains widespread accessibility issues that interfere with the ability of blind and visually impaired users to navigate the site, understand product information, and interact with essential features. These barriers affect the usability of the website for individuals who depend on screen-reading technology and limit their ability to participate in online retail on equal terms with sighted consumers.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12182 because Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, et seq.

13. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, including those under the New York State Human Rights Law, Article 15 (Executive Law § 290 et seq.) ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq., ("NYCHRL") and § 296 et seq.; and the New York State Civil Rights Law, Article 4, §§ 40-c and 40-d ("NYCRL").

14. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because Defendant HSN, INC., conducts substantial, continuous, and systematic business within this District through its highly interactive, public-facing website, www.HSN.com. Plaintiff repeatedly accessed and attempted to use the Website from her residence in **New York County,** which lies

within the Southern District of New York ("SDNY"). A significant portion of the discriminatory conduct giving rise to this action—including the denial of equal access to Defendant's online information and services—occurred within this District.

15. Defendant is registered to do business in New York State and has been conducting business in New York, including within this District. Defendant participates in New York's economic life by performing business over the Internet and which offers nationwide access to consumer goods across categories such as beauty, home, electronics, apparel, jewelry, and seasonal merchandise. The website functions as a primary platform for browsing products, reviewing descriptions, comparing prices, accessing promotions, and completing purchases. Through www.HSN.com, Defendant knowingly and repeatedly transmits digital content, files, and data to consumers in New York. Courts have consistently held that such purposeful, repeated online commercial activity constitutes sufficient minimum contacts for personal jurisdiction. See *Reed v. 1-800-Flowers.com, Inc.,* 327 F. Supp. 3d 539 (E.D.N.Y. 2018)**;** *Andrews v. Blick Art Materials, LLC*, 286 F. Supp. 3d 365 (E.D.N.Y. 2017)**;** *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court,* 592 U.S. ___ (2021)**;** *South Dakota v. Wayfair, Inc.,* 585 U.S. ___ (2018)**;** *Godfried v. Ford Motor Co.,* 2021 U.S. Dist. LEXIS 87012 (D. Me. May 6, 2021)**;** *Romero v. 88 Acres Foods, Inc.,* 2022 U.S. Dist. LEXIS 9040 (S.D.N.Y. Jan. 18, 2022)**;** *Sanchez v. NutCo, Inc.,* 2022 U.S. Dist. LEXIS 51247 (S.D.N.Y. Mar. 22, 2022)**;** *Panarra v. HTC Corp.*, No. 6:20-cv-6991 (W.D.N.Y. Apr. 15, 2022)**.**

16. Thus, jurisdiction and venue are appropriate in this District because Plaintiff resides here, accessed the Website from within this District, and suffered injury here. Courts within this Circuit have consistently held that website accessibility barriers encountered by users within

the District provide a sufficient basis for personal jurisdiction over out-of-state website operators whose digital platforms target or serve New York consumers.

## THE PARTIES

17. Plaintiff, BETH KRAMER, is and was at all relevant times a resident of New York County, New York.

18. Plaintiff is legally blind and visually impaired, qualifying as an individual with a disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(1)–(2), its implementing regulations at 28 C.F.R. §§ 36.101 et seq., the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). As documented by Dr. Kyle Kovacs, MD, St. Giles Associate Professor of Clinical Ophthalmology at Weill Cornell Medicine, on April 12, 2025, Plaintiff suffers from advanced Macular Degeneration complicated by Retinal Detachment, resulting in best-corrected visual acuity of 20/320 in the right eye **and** 20/280 in the left eye, severe central field loss, dense scotomas, markedly reduced contrast sensitivity, and a functional visual field of approximately 15–18 degrees. Plaintiff is unable to read standard print or visually interpret digital interfaces and relies exclusively on screen-reading software, including NonVisual Desktop Access ("NVDA"), to access online content and complete transactions independently.

19. Upon information and belief, HSN, Inc. is a long-standing American retail company headquartered at 1 HSN Drive, St. Petersburg, Florida 33729. The company operates the well-known HSN (Home Shopping Network) brand, which markets and sells a wide range of consumer goods, including beauty products, home goods, electronics, apparel, jewelry, kitchenware, and seasonal merchandise. HSN reaches customers nationwide through a

combination of televised shopping channels, digital livestreaming platforms, mobile applications, and its primary e-commerce website, www.hsn.com.

20. HSN, Inc. functions as part of the broader Qurate Retail Inc. corporate family, a global retail conglomerate that oversees several consumer-facing brands. Within this structure, HSN maintains operational control over its digital properties, including the design, coding, maintenance, and content management of HSN.com. . The company is responsible for the digital architecture, product listings, promotional materials, and interactive features that appear on the website.

21. The company's e-commerce platform is a central component of its business model. HSN.com serves as a primary retail destination for millions of consumers across the United States, offering product discovery, detailed descriptions, pricing information, customer reviews, promotional offers, and online purchasing capabilities. The website is accessible to customers nationwide, including residents of New York, and is marketed as a fully interactive shopping environment.

## NATURE OF ACTION

22. This action arises under Title III of the Americans with Disabilities Act**,** 42 U.S.C. § 12181 *et seq.,* challenging Defendant's operation of a public-facing commercial website that denies blind and visually impaired individuals full and equal access to its goods, services, and digital content. Plaintiff, a legally blind resident of this District, attempted to access Defendant's website using screen-reading software but encountered multiple, programmatically detectable access barriers that prevented meaningful engagement with its products and services. Defendant's failure to design, construct, and maintain its website in accordance with the Web Content

Accessibility Guidelines ("WCAG") 2.1 Level AA constitutes unlawful discrimination and violates federal accessibility standards.

23. The Internet has become an essential tool for daily life, serving as a primary means of obtaining healthcare information, researching medical conditions, accessing pharmaceutical guidance, communicating with providers, and navigating essential goods and services. This is true for sighted individuals and blind or visually impaired individuals alike. For blind consumers, accessible websites are not a convenience—they are a **necessity** for independent living, informed healthcare decision-making, and equal participation in modern commerce.

24. Blind and visually impaired individuals access websites using keyboards in conjunction with screen-reading software that vocalizes visual content or displays it on a refreshable Braille device. This technology is the only method by which blind individuals can independently navigate the Internet. Unless websites are properly coded to interface with screen-reading software, blind users cannot perceive or interact with the information, products, or services offered online.

25. Users of Windows-enabled computers have access to several screen-reading programs, including Job Access With Speech ("JAWS"), which is commercially available, and NonVisual Desktop Access ("NVDA"), which is open-source. These tools are indispensable for blind users and represent the only means by which they can independently navigate the Internet.

26. Plaintiff, Beth Kramer**,** is a blind and visually impaired individual and a member of a protected class under the ADA, 42 U.S.C. § 12102(1)–(2), its implementing regulations at 28 C.F.R. §§ 36.101 et seq., the NYSHRL, and the NYCHRL. Due to advanced Macular Degeneration complicated by Retinal Detachment, Plaintiff suffers from profound central vision

loss, dense scotomas, and markedly reduced contrast sensitivity. She relies exclusively on NVDA to access digital content, including e-commerce websites such as Defendant's.

27. For screen-reading software to function, website content must be capable of being rendered into text. If the underlying code fails to support this conversion, blind users are unable to access the same content available to sighted users. As explained in *Andrews v. Blick Art Materials, LLC***,** 286 F. Supp. 3d 365, 375 (E.D.N.Y. 2017), screen-reading software "translates the visual Internet into an auditory equivalent," allowing blind users to navigate websites through auditory cues rather than visual ones. When websites lack proper coding, these cues disappear, rendering the site unusable. According to the American Foundation for the Blind, approximately twenty-six million American adults report significant visual impairment, underscoring the widespread need for accessible digital design.

28. The World Wide Web Consortium ("W3C") has published WCAG 2.0 and 2.1, internationally recognized standards for digital accessibility. These guidelines are widely adopted by private entities and government agencies, including the U.S. Department of Justice, and have been repeatedly recognized by federal courts as the appropriate benchmark for ADA compliance.

29. Non-compliant websites pose recurring and predictable barriers to blind and visually impaired users. Common violations include, but are not limited to:

a. Missing text equivalents for non-text elements;

b. Unlabeled frames and navigation regions;

c. Scripts without accessible alternatives;

d. Inaccessible forms and input fields;

e. Content conveyed solely through visual presentation;

f. Inability to resize text without loss of functionality;

g. Time limits that cannot be adjusted or disabled;

h. Missing or ambiguous page titles;

i. Links lacking descriptive context;

j. Keyboard focus indicators that are not discernible;

k. Undetectable default language settings;

l. Components that trigger unexpected context changes;

m. Settings that alter context without user notice;

n. Input fields lacking labels or instructions, including inaccessible CAPTCHA prompts;

o. Improperly nested markup, duplicate attributes, and non-unique IDs;

p. Inaccessible Portable Document Format (PDF) files;

q. User interface elements whose roles, states, and values cannot be programmatically determined or conveyed to assistive technology.

## STATEMENT OF FACTS

30. Plaintiff Beth Kramer is a legally blind consumer residing in New York County, New York. Due to advanced Macular Degeneration complicated by Retinal Detachment, Ms. Kramer experiences profound central vision loss, dense scotomas, markedly reduced contrast sensitivity, and a functional visual field of approximately 15–18 degrees. As documented by Dr. Kyle Kovacs, MD of Weill Cornell Medicine on April 12, 2025, her best-corrected visual acuity measures 20/320 in the right eye and 20/280 in the left eye, meeting the federal and New York State definitions of legal blindness. She is unable to read standard print or visually interpret digital

interfaces and relies exclusively on NVDA screen-reading software to access online content and complete transactions independently.

31. On three separate occasions—November 15, 2025, November 20, 2025, and December 10, 2025—Ms. Kramer attempted to use the website www.hsn.com using the screen-reader, NVDA to browse and obtain information about various skincare products sold through HSN's online retail platform. These visits were part of her routine efforts to research and purchase personal-care items that she uses to manage her daily needs.

32. Ms. Kramer has been a long-time user of HSN's retail platform because HSN offers a curated shopping environment that differs meaningfully from other online retailers. HSN's product catalog includes a wide range of specialized beauty and skincare brands—such as Isomers—that are not consistently available through mainstream retailers or are offered in exclusive configurations, bundles, or formulations. For consumers who rely on specific products to manage their skincare routines, HSN's assortment provides access to items that may be difficult to locate elsewhere or are sold in limited quantities through other channels.

33. During these visits, Ms. Kramer attempted to access detailed information about several products, including the **Isomers Skincare Glutathione Antioxidant Serum**, priced at $42.00. [1] This product is described as an antioxidant-rich serum formulated with glutathione and resveratrol to help brighten the skin and support a more even tone. It also contains peptides and hyaluronic acid intended to hydrate and nourish all skin types. Ms. Kramer sought to review the

---

[1] Isomers is a science-driven skincare brand known for its clinical formulations, high-concentration active ingredients, and detailed ingredient transparency. For visually impaired consumers, these characteristics make the brand particularly appealing. Because Isomers formulates its products in its own laboratory and emphasizes the functional purpose of each ingredient, consumers who cannot visually inspect packaging or rely on visual marketing cues can make decisions based on clear, substantive information rather than aesthetics.

product description, ingredients, usage instructions, and pricing information to determine whether the serum met her skincare needs.

34. Ms. Kramer also attempted to access information about the **Isomers Fast Lift Eye Serum**, priced at $39.95. [2] This serum is formulated with a multi-peptide complex and is marketed as a fast-acting corrective eye treatment. [3] Ms. Kramer attempted to review the product details, formulation information, and customer reviews to evaluate whether the product was suitable for her.

35. HSN's long-standing partnership with **Isomers** also means that many of the brand's products are introduced, explained, and demonstrated verbally by the founder or brand representatives. These presentations often include detailed descriptions of texture, scent, application methods, ingredient benefits, and expected results. For blind consumers, this level of spoken detail provides access to information that is typically conveyed visually on product packaging or through imagery on standard e-commerce sites.

36. While attempting to access these products, Ms. Kramer encountered numerous accessibility barriers that prevented NVDA from reading or interpreting essential content on the product pages. These barriers included missing or placeholder alternative text on product images,

---

[2] Isomers is a Canadian laboratory-based specialty skincare brand known for science-driven formulations, high-concentration actives, and a clinical, ingredient-focused approach to skin health. They're not a mass-market beauty line — they operate more like a **cosmeceutical lab** that sells directly to consumers through select channels, with HSN being one of their primary retail partners.

[3] A multi-peptide complex is a skincare formulation that contains several different peptides blended together **t**o target multiple signs of skin aging at the same time. Peptides are short chains of amino acids — the building blocks of proteins like collagen**,** elastin**,** and keratin**.**

unlabeled interactive controls, broken links, empty URLs, and pricing information that was not programmatically conveyed. As a result, NVDA was unable to provide her with meaningful descriptions of the products, their features, or their pricing.

37. For instance, the accessibility barriers Ms. Kramer encountered on HSN.com directly affected her ability to locate, evaluate, and purchase the specific products she intended to buy, including items from specialty skincare brands such as Isomers. Because Ms. Kramer is blind and relies exclusively on screen-reading technology, she depends on accurate labeling, proper structural markup, and consistent navigation cues to identify products, understand their features, and complete transactions. The barriers documented in the audit reports—such as unlabeled buttons, missing alternative text, inaccessible product images, improperly coded controls, and non-descriptive links—occurred precisely on the pages and interface elements she needed to use to access these products.

38. For example, when attempting to access the Isomers Fast Lift Eye Serum and other targeted skincare treatments, Ms. Kramer encountered product tiles and images that lacked alternative text or contained generic labels such as “image” or “button.” Without meaningful descriptions, her screen reader could not convey which product she was selecting, what variant or size was being offered, or whether the item matched the one she intended to purchase. These missing labels prevented her from distinguishing between similar products within the same brand family, a critical task for a consumer who cannot rely on visual cues.

39. In addition, several interactive elements on the product pages—such as “Add to Bag,” quantity selectors, auto-ship options, and dropdown menus—were either unlabeled, improperly coded, or inaccessible to keyboard navigation. These barriers prevented Ms. Kramer

from completing essential shopping tasks, including adding the desired product to her cart, reviewing available configurations, or confirming pricing and promotional details. Because HSN frequently offers exclusive bundles, supersizes, and limited-edition sets for brands like Isomers, the inability to access these controls meant she could not determine whether she was selecting the correct configuration or receiving the value she sought.

40. The audit also identified structural barriers within the site's navigation and search functions, including headings that were out of order, links that lacked descriptive text, and filters that were not operable with assistive technology. These issues directly impeded Ms. Kramer's ability to search for the products she wanted, refine results by brand or category, and move efficiently through product listings. As a result, she could not reliably locate the specific items she intended to purchase, even when she knew they were available on the site.

41. Taken together, these barriers were not abstract or theoretical. They occurred at the exact points where Ms. Kramer attempted to access the products she sought, and they prevented her from performing the basic tasks required to evaluate and purchase those items. The inaccessibility of these product-specific pages and controls denied her full and equal access to HSN's goods and services and directly interfered with her ability to complete the transactions she intended to make.

42. On December 15, 2025, and January 13, 2026, Joseph & Norinsberg, LLC's ADA Compliance Chief conducted accessibility audits of www.hsn.com utilizing PowerMapper's **SortSite** program, [4] which identified widespread issues affecting product pages that Ms. Kramer

[4] PowerMapper's **SortSite** is an automated website-scanning tool that evaluates entire websites for a wide range of

attempted to access. These included:

- **41 Level A issues across 14,530 pages** involving placeholder or incorrect alt text;
- **92 pages** with unlabeled ARIA controls;
- **Multiple pages** with ARIA-hidden elements containing focusable content;
- **18 pages** with empty headings;
- **Thousands of pages** containing broken links, including repeated 400 and 404 errors;
- **Over 2,600 pages** with empty href="" or src="" attributes;
- **Carousels and interactive elements** lacking proper labeling;
- **Iframes without descriptive titles**;
- **Pricing information** not programmatically distinguishing original from discounted prices.

**{See Exhibit A – Sort Site Audit Report}**

43. Because Ms. Kramer relies exclusively on NVDA to access online content, these barriers prevented her from independently reviewing the product descriptions, ingredient lists, usage instructions, and pricing information for the items she sought. NVDA frequently announced silence, skipped essential content, or failed to identify interactive elements, making it difficult or impossible for her to understand or interact with the product pages.

44. As a result of these barriers, Ms. Kramer was unable to independently evaluate or

---

quality and accessibility issues. It performs a comprehensive crawl of all reachable pages and checks each one against **over 1,200–1,300 standards-based checkpoints**, including accessibility, broken links, browser compatibility, search optimization, usability, and web standards compliance.

SortSite is used by federal agencies, Fortune 100 companies, and independent consultancies as a one-click testing solution that can analyze large websites far more quickly than manual review. The tool is available as both a desktop application and a cloud-based web application, allowing it to scan public sites, intranets, and development environments on Windows or macOS systems

purchase the products she sought on November 15, November 20, and December 10, 2025. The lack of accessible product information, combined with structural and navigational barriers, prevented her from completing the tasks she attempted during each visit.

45. HSN's assortment includes a number of specialty skincare brands—such as Isomers, Skinn, Prai, and others—that are not consistently available through major retailers or are offered in unique configurations. For blind consumers, the ability to access these specialty brands in one centralized platform reduces the need to navigate multiple websites with varying accessibility levels. Instead of searching across different retailers, each with its own layout and coding practices, consumers can rely on HSN as a single, familiar environment where their preferred brands are consistently available.

46. HSN's assortment includes a number of specialty skincare brands—such as Isomers, Skinn, Prai, and others—that are not consistently available through major retailers or are offered in unique configurations. For blind consumers, the ability to access these specialty brands in one centralized platform reduces the need to navigate multiple websites with varying accessibility levels. Instead of searching across different retailers, each with its own layout and coding practices, consumers can rely on HSN as a single, familiar environment where their preferred brands are consistently available.

47. HSN's exclusive pricing, installment options, and curated bundles further enhance the appeal of these specialty brands. For consumers who rely on specific formulations or active ingredients, the ability to purchase products in cost-effective sets or larger sizes provides both convenience and value. This combination of accessibility, product availability, and educational content makes HSN a preferred destination for blind consumers seeking specialty skincare

products.

48. Plaintiff intends to return to www.HSN.com once the accessibility barriers are remediated because HSN offers a combination of products, brands, and shopping features that she cannot easily find elsewhere. HSN carries specialty skincare lines such as Isomers, along with exclusive bundles, supersized configurations, and value-based sets that are not consistently available through other retailers. These offerings are important to Ms. Kramer because they allow her to purchase the specific formulations she prefers at competitive prices, often in larger or more cost-effective quantities. The website is the only channel where the full range of these products is available, making it the primary platform she relies on for accessing the items she uses in her daily routine.

49. In addition, HSN's product presentation style—featuring detailed spoken descriptions, ingredient explanations, and educational demonstrations—provides Ms. Kramer with information that is especially valuable to blind consumers. Because she cannot visually inspect packaging or rely on images, she depends on the verbal detail offered through HSN's televised and digital content to understand how a product works and whether it meets her needs. This level of accessible product education is not replicated on other retail sites. Once the website's accessibility issues are corrected, Ms. Kramer will be able to navigate the platform independently, evaluate products with confidence, and complete purchases without assistance. For these reasons, she fully intends to return to HSN.com to shop for the products she prefers.

## CLASS ACTION ALLEGATIONS

50. Plaintiff also seeks certification of a New York Subclass under Fed. R. Civ. P. 23(a)

and 23(b)(2), defined as: All legally blind individuals residing in the State of New York who have attempted to access www.HSN.com and were similarly denied equal access to its offerings due to the same systemic accessibility barriers.

51. Common questions of law and fact exist among the Class and Subclass, including but not limited to:

-  Whether www.HSN.com qualifies as a "public accommodation" under Title III of the ADA;
-  Whether Defendant's Website constitutes a "place or provider of public accommodation" under the NYCHRL;
-  Whether the Website's persistent accessibility barriers violate the ADA by denying blind users full and equal access to HSN's information, services, and digital content;
-  Whether the same barriers violate the NYCHRL, NYCRL, and NYSHRL by excluding blind users from meaningful participation in the digital marketplace;
-  Whether Defendant failed to adopt and implement accessibility policies consistent with **WCAG 2.1 Level AA**;
-  Whether injunctive relief is warranted to remedy Defendant's ongoing violations.

52. Plaintiff's claims are **typical** of the claims of the Class. Like other blind individuals, she relies on screen-reading software and keyboard navigation to access online platforms. She encountered the same systemic barriers—missing alternative text, inaccessible buttons, unlabeled form fields, broken ARIA references, improper heading structure, and mouse-dependent controls—that affect all Class members attempting to use Defendant's Website.

53. Plaintiff will fairly and adequately represent the interests of the Class. She has retained counsel experienced in disability rights and complex class action litigation. Plaintiff has no interests antagonistic to those of the Class and seeks injunctive and declaratory relief applicable to all members.

54. Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or failed to act on grounds generally applicable to the Class, warranting injunctive relief to remediate the website's accessibility barriers.

55. Alternatively, certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law and fact predominate over individual issues, and a class action is the most efficient and fair method for adjudicating these claims.

56. Maintaining this action as a class proceeding will promote judicial economy by avoiding duplicative litigation and ensuring uniform relief for a class likely to include hundreds, if not thousands, of blind individuals who have attempted to use www.ancestry.comand faced exclusion.

**FIRST CAUSE OF ACTION**
**(Violations of the ADA, 42 U.S.C. § 12182 *et seq.)***

57. Plaintiff, BETH KRAMER, on behalf of herself and the Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

58. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 *et seq.,* provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

59. Defendant's Website that is offered as a link to the company is a service that is offered to the general public, and as such, must be equally accessible to all potential consumers.

60. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

61. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, inter alia:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; [and] a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

62. The acts alleged herein constitute violations of Title III of the ADA and the regulations promulgated thereunder. Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits her major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A)-(2)(A). Furthermore, Plaintiff has been denied full and equal access to the Website, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services

provided to non-disabled persons. Defendant has failed to take any prompt and equitable steps to remedy the discriminatory conduct as the violations are ongoing.

63. Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth within the section **Prayer For Relief** below.

## SECOND CAUSE OF ACTION
**(New York State Human Rights Law)**
**("NYSHRL")**

64. Plaintiff, BETH KRAMER, on behalf of herself and the Class and New York City Sub-Classes Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

65. At all times relevant to this action, the New York State Human Rights Law ("NYSHRL"), Article 15 of the New York Executive Law §§ 290 *et seq.*, covers the actions of the Defendants.

66. Plaintiff, at all times relevant to this action, as a result of her loss of vision, has a substantial impairment to a major life activity and is an individual with a disability under Article 15 of N.Y. Executive Law § 292(21).

67. Defendants, at all relevant times to this action, own and operate a place of public accommodation, the subject Website, www.HSN.com within the meaning of Article 15 of N.Y. Executive Law § 292(9). Defendant is a "person" within the meaning of Article 15 of N.Y. Executive Law § 292(1).

68. Plaintiff has visited the Website on a number of occasions and has encountered barriers to her access that exist.

69. Under Article 15 N.Y. Executive Law § 296(2)(a) "it shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation ... because of the ... disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

70. Discrimination includes the refusal to adopt and implement reasonable modifications in policies, practices, or procedures when they are necessary to afford facilities, privileges, advantages, or accommodations to individuals with disabilities. Article 15 of N.Y. Executive Law § 296(2)(a), § 296(2)(c)(i).

71. Defendant's actions violate Article 15 of N.Y. Exec. Law § 296(2)(a) by discriminating against the Plaintiff and Subclass by (i) owning and operating a website that is inaccessible to disabled individuals who are sight-impaired and cannot discern the content thereof without the use of a screen-reading program; (ii) by not removing access barriers to its Website in order to make accessibility features of the sites known to disabled individuals who are sight-impaired; and (iii) by refusing to modify the Website when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities. This inaccessibility denies disabled individuals who are sight-impaired full, and equal access to the facilities, goods, and services that the Defendant makes available to individuals who are not disabled and can see without the need of a screen-reading program or other similar device. Article 15 of N.Y. Exec. Law § 296(2)(c).

72. The Defendant's discriminatory practice also includes, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden." Article 15 of N.Y. Exec. Law § 296(2)(c).

73. Established guidelines exist for making websites accessible to disabled individuals. The International Website Standards Organization, the Worldwide Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 is well-established guideline for making websites accessible to the blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure websites are accessible.

74. Defendant has intentionally and willfully discriminated against the Plaintiff and Subclass and violation of the New York State Human Rights Law, Article 15 of N.Y. Exec. Law § 296(2) and the discrimination continues to date.

75. Absent injunctive relief, Defendant's discrimination will continue against Plaintiff and Subclass, causing irreparable harm.

76. Plaintiff and the Subclass are therefore entitled to compensatory damages, civil penalties, and fines for every discriminatory act in addition to reasonable attorney fees and costs and disbursements of this action. Article 15 of N.Y. Exec. Law §§ 297(9), 297(4)(c) *et seq.*

**THIRD CAUSE OF ACTION**
**(Violation of New York State Civil Rights Law) ("NYCRL")**

77. Plaintiff, BETH KRAMER, on behalf of herself and the New York City Subclass Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

78. Plaintiff served notice thereof upon the New York State Attorney General, as required by N.Y. Civil Rights Law § 41. (Exhibit 1) (Notice to Attorney General)

79. Persons within New York State are entitled to full and equal accommodations, advantages, facilities, and privileges of places of public accommodations, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. No person, being the owner of a place of public accommodation, shall directly or indirectly refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, and privileges thereof. N.Y. Civ. Rights Law § 40.

80. No person because of disability, as defined in § 292(21) of the Executive Law, shall be subjected to any discrimination in his or her civil rights by person or by any firm, corporation, or institution, or by the state or any agency or subdivision. N.Y. Civ. Rights Law ("NYCRL") § 40-c.

81. § 292 of Article 15 of the N.Y. Executive Law deems a disability a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions that prevent the exercise of a normal bodily function. As such, the Plaintiff is disabled under the N.Y. Civil Rights Law.

82. Defendant discriminates against the Plaintiff and Subclass under NYCRL § 40 as

Defendant's Website is a place of public accommodation that does not provide full and equal accommodation, advantages, facilities, and privileges to all persons and discriminates against disabled individuals who are sight impaired.

83. Defendant intentionally and willfully failed to remove the barriers on their Website, discriminating against the Plaintiff and Subclass preventing access in violation of NYCRL § 40.

84. Defendant has failed to take any steps to halt and correct its discriminatory conduct and discriminate against the Plaintiff and the Subclass members.

85. Under N.Y. Civil Rights Law § 41, "a corporation which violates any of the provisions of §§ 40, 40-a, 40-b or 42 shall be liable for a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby… in any court of competent jurisdiction in the county in which the plaintiff or defendants shall reside." *Id*...

86. Plaintiff and the SubClass hereby demand compensatory damages of five hundred dollars ($500.00) for the Defendant's acts of discrimination, including civil penalties and fines under N.Y. Civil Law § 40 *et seq*.

## FOURTH CAUSE OF ACTION
## (Violations of the New York City Human Rights Law)
## ("NYCHRL")

87. Plaintiff, BETH KRAMER, on behalf of herself and the New York City Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

88. N.Y.C. Administrative Code § 8-107(4)(a) provides that "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee,

proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation: [b]ecause of any person's . . . disability . . . directly or indirectly: [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation".

89. Defendant is subject to NYCHRL because it owns and operates the Website www.HSN.com making it a "person" within the meaning of N.Y.C. Admin. Code § 8-102(1).

90. Defendant violates N.Y.C. Administrative Code § 8-107(4)(a) in refusing to update or remove access barriers to Defendant's Website, causing the Website and the services integrated completely inaccessible to the blind. This inaccessibility denies blind patrons full and equal access to the facilities, products, and services that Defendant makes available to the non-disabled public.

91. Defendant is required to "make reasonable accommodation to the needs of persons with disabilities . . . any person prohibited by the provisions of [§ 8-107 *et seq.*] from discriminating based on disability not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

92. Defendant's actions constitute willful intentional discrimination against the Sub-Class based on a disability in violation of the N.Y.C. Administrative Code § 8107(4)(a) and § 8-107(15)(a), in that Defendant has:

a. constructed and maintained a Website that is inaccessible to blind class members with knowledge of the discrimination; and/or

b. constructed and maintained a Website that is sufficiently intuitive and/or obvious that is inaccessible to blind class members; and/or

c. failed to take actions to correct these access barriers in the face of substantial harm and discrimination to blind class members.

93. Defendant has failed to take any prompt and equitable steps to remedy the discriminatory conduct as these violations are ongoing.

94. As such, Defendant discriminates and will continue in the future to discriminate against Plaintiff and other members of the proposed class and subclass based on disability in the full and equal enjoyment of the products, services, facilities, privileges, advantages, accommodations and/or opportunities of the Website under N.Y.C. Administrative Code § 8-107(4)(a). Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff and members of the Class will continue to suffer irreparable harm.

95. Defendant's actions were to violate the NYCHRL, and therefore, Plaintiff invokes the right to injunctive relief to remedy the discrimination.

96. Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines under N.Y.C. Administrative Code § 8-120(8) and § 8-126(a) for each offense as well as punitive damages pursuant to § 8-502.

97. Plaintiff is also entitled to reasonable attorneys' fees and costs.

98. Under N.Y.C. Administrative Code § 8-120 and § 8-126 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

**FIFTH CAUSE OF ACTION**
**(Declaratory Relief)**

99. Plaintiff, BETH KRAMER, on behalf of herself and the Class and New York City Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

100. An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies, that the Website contains access barriers denying blind customers the full and equal access to the products, services and facilities of the Website, which Defendant owns, operates and controls, fails to comply with applicable laws including, but not limited to, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.*, and N.Y.C. Admin. Code § 8-107, *et seq.*, prohibiting discrimination against the blind.

101. A judicial declaration is necessary and appropriate at this time so that each of the parties may know its respective rights and duties and act accordingly.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a. A preliminary and permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq., N.Y.C. Administrative Code § 8-107, et seq., and the laws of New York;

b. A preliminary and permanent injunction requiring Defendant to take all the steps necessary to make the Website fully compliant with the requirements set forth in the ADA, and the implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

c. A declaration that Defendant owns, maintains and/or operates the Website in a manner that discriminates against the blind and which fails to provide access for persons with disabilities as required by Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq., N.Y.C. Administrative Code § 8-107, et seq., and the laws of New York;

d. An order certifying the Class and Sub-Classes under Fed. R. Civ. P. 23(a) & (b)(2) and/or (b)(3), appointing Plaintiff as Class Representative, and

Plaintiff's attorneys as Class Counsel;

e. Compensatory damages in an amount to be determined by proof, including all applicable statutory and punitive damages and fines, to Plaintiff and the proposed class and subclasses for violations of civil rights under New York City Human Rights Law, the New York State Human Rights Law and the New York State Civil Rights Law;

f. Pre-judgment and post-judgment interest;

g. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

h. Such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact the Complaint raises.

Dated: New York, New York
January 14, 2026

Respectfully submitted,
**JOSEPH & NORINSBERG, LLC**
*/s/ Robert Schonfeld*
Robert Schonfeld, Esq
*Attorneys for Plaintiff*
825 Third Avenue, Suite 2100
New York, New York 10022
Tel. No.: (212) 227-5700
Fax No.: (212) 656-1889
rschonfeld@employeejustice.com